DAVID LIEBERMAN, Appellant, *v.* THE TEMPLAR MOTORS COMPANY, Respondent.

First Department, July 14, 1922.

Sales — action to recover purchase price of automobile bodies to be manufactured — recovery cannot be had under original contract which was not sued on — no recovery can be had where there is no proof that bodies were built in accordance with contract or of identity of bodies for which payment is claimed, or delivery of bodies by carrier to defendant — bill of lading and invoices inconsistent — action for breach of contract as modified — question for jury under Personal Property Law, § 126, whether defendant was guilty of such breach as would entitle plaintiff to sue for breach of entire contract — Statute of Frauds — original contract was by its terms not to be performed within one year — no recovery on contract as modified where modifications, material in scope, were oral.

The plaintiff's assignor and the defendant's assignor entered into a contract for the manufacture by the former for the latter of 2,500 aluminum automobile bodies at a specified price per body, which price was subsequently changed in writing. The complaint states two causes of action, one for goods sold and delivered and the other for breach of contract, and is based, not on the original contract, but on that contract as modified by an oral agreement subsequently entered into between the parties which changed the terms relating to the amount

of each delivery, the manner of delivery, the provision for inspection of the bodies, the time of payment and the requisites therefor.

*Held*, that the plaintiff cannot recover upon the original contract because he has not sued under it nor were the deliveries made as called for therein.

Treating the cause of action as one for goods sold and delivered, the plaintiff cannot recover for several reasons: *First*, there was no proof that the bodies shipped, and for which payment is sought, were completed in accordance with the original contract, or even with the modified contract or with the specifications agreed on; *second*, there was no proof of the reasonable value of the bodies at the claimed time of delivery to the carrier; *third*, the bills of lading and the invoices did not correspond as to their dates or amount of shipments; *fourth*, it is impossible to identify any particular bodies with those called for by the bills of lading and there is no proof to aid this defect; *fifth*, even under plaintiff's theory as to the modified contract, he cannot recover because he failed to prove that the bodies were completed according to the specifications, that they had been inspected by defendant's inspector or that the invoices had been approved by him; *sixth*, there is no proof that the bodies which the plaintiff claims had not been paid for at the time of delivery to the carrier were not paid for by the defendant's assignor under the terms of the modified contract at the time they were stored at the plant of the plaintiff's assignor; *seventh*, there is no proof to explain what became of the goods after their alleged delivery to the carrier nor was it shown that they ever reached the defendant or were delivered to it.

As to the second cause of action based on the alleged breach of the contract by the defendant's assignor, if the plaintiff had proved performance on the part of his assignor of a valid contract, it would, in view of the testimony, have been a question of fact for the jury whether, under section 126 of the Personal Property Law, defendant had been guilty of such a breach of the contract as would have entitled plaintiff to sue for damages as for breach of the entire contract.

The original contract for the manufacture of 2,500 automobile bodies was, by its terms, not to be performed within one year, for it appears that it was dated August 21, 1919, and that deliveries were to commence on December 1, 1919, and were to be made at the rate of ten per day, and, therefore, the modifications which were material in scope and were so extensive as to in fact constitute a practically new contract were invalid and unenforcible, since they were not in writing as required by the Statute of Frauds.

APPEAL by the plaintiff, David Lieberman, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 20th day of May, 1921, upon the dismissal of the complaint at the close of the plaintiff's case.

*Celler & Kraushaar* [*David L. Podell* of counsel; *Meyer Kraushaar* and *Emanuel Celler* with him on the brief], for the appellant.

*Hays & Wadhams* [*C. E. Mellen* of counsel; *John Schulman* with him on the brief], for the respondent.

DOWLING, J.:

The complaint herein sets forth two causes of action. The first cause of action alleges that about August 21, 1919, plaintiff's assignor, the Hudson Auto Body Corporation, entered into a written

agreement with defendant's assignor, the Templar Motors Corporation, for the manufacture by the former for the latter of 2,500 aluminum roadster bodies, left-hand drive, according to blueprint and specifications attached to and forming a part of the agreement, the Hudson Company to frame up at once a working model to be approved by the motors company, after which no general change was to be made in the specifications, or if changes were made, they were to be paid for by the motors company; deliveries to commence December 1, 1919, at the rate of ten per day. The motors company agreed to pay therefor $130 per body f. o. b. freight cars, New York city. The contract further provided that in the event that all railroad connections available between Cleveland, O., and New York were unable to accept freight on account of strikes or any conditions beyond the control of the Hudson Company, the latter was to have the completed automobile bodies stored at the rate of delivery scheduled, and upon turning over storage receipts for the bodies so stored, together with regular invoices therefor, the invoices were to be in the same status for payment as if the bodies had been actually shipped. In case storage became necessary, the motors company reserved the right to have the bodies finally inspected by its inspectors, who were to determine whether or not they were acceptable, such inspection to be made immediately upon notice that the bodies were ready therefor. At the termination of the emergency causing storage, the Hudson Company was to proceed with loading and shipping the bodies so stored as though delivered from their plant. Invoices were to be dated the day the bodies were accepted by transportation companies for shipment, and those dated the first to tenth, inclusive, were to be due and payable on the twentieth instant; those dated eleventh to twentieth, to be due and payable on the thirtieth instant; and those dated from the twenty-first to the last of the month were to be due and payable the tenth of the following month. It was further provided that the order embraced construction and equipment especially designed for the use of the buyer, and it was not subject to cancellation except upon mutual agreement and arrangement therefor; and that the buyer waived all claims for either cancellation or damages for delay in the execution of the work through delay by reason of strikes, lockouts, delay in delivery of materials, delay occasioned by a state of war or by reason of any state of facts not within the control of the manufacturer. The complaint then sets forth that thereafter, from time to time, the blueprint and specifications were modified by mutual consent; that the Hudson Company entered upon the performance of the contract, and while so engaged, and by reason of facts not

within its control, its employees went on strike and refused to work, and it was unable to obtain other workmen, by reason whereof it was prevented from delivering the bodies according to contract. About October 17, 1919, the Templar Company was notified of the strike, and to induce the Hudson Company to continue performance of the contract, it waived the delay in delivery and agreed to continue performance of the contract after the strike had ceased, which occurred on January 31, 1920. The bodies which the Hudson Company had been unable to complete during the strike it finished after its termination, and they were accepted by the Templar Company upon delivery. Prior to the completion of any bodies on January 21, 1920, the parties entered into an agreement modifying the contract in certain particulars by providing for certain extra work not included in the specifications or proposal, and for which the Templar Company agreed to pay $6 additional for each body, making the total price $136. This is evidenced by letters passing between the parties. Thereafter on April 1, 1920, the Templar Company assigned all its assets to defendant, which assumed all the obligations of the former, including the contract in question. On April 13, 1920, the parties agreed that in consideration of a rail being added to future bodies, defendant would pay an additional price of $3, making the cost $139 per body. On April 26, 1920, for extra work in putting in cross bars under the sills for shipping, an allowance of 15 cents per body was made, making the total cost $139.15. Between March 13 and 18, 1920, the Hudson Company sold to the Templar Company certain material to be used in the manufacture of the bodies, to the value of $30,000, in consideration of which the former agreed to deduct $12 from the purchase price of each body, thus reducing the cost to $127.15. Prior to May 16, 1920, the railroad facilities were such as made it difficult to obtain freight cars in which to ship a reasonable number of bodies per car, by reason of conditions beyond the control of the Hudson Company, and so on May 16, 1920, at the Hotel Pennsylvania in the city of New York, the parties entered into a further agreement modifying the contract so that defendant should pay the Hudson Company the purchase price for each body manufactured every week thereafter, upon receipt of an invoice during such week, in consideration of the Hudson Company storing such bodies upon its premises, instead of in a public warehouse, whenever all railroad connections available between New York and Cleveland were unable to accept freight on account of strike or any conditions beyond the control of the shipper, or whenever the shipper was unable to obtain from the railroad a freight car in which to ship a reasonable number of bodies per car.

Thereafter the Hudson Company sent to defendant invoices of the total production of bodies each week prior to July 23, 1920, the said invoices were paid for by defendant, and the Hudson Company stored the bodies upon the premises, instead of in a public warehouse, to the limit of its capacity, without additional charge to the defendant. In all other respects it is alleged that the said contract was in full force and virtue, except that the provision thereof requiring delivery of said bodies to be at the rate of ten bodies per day was waived by defendant, in that the defendant accepted deliveries of bodies less than at the rate of ten per day, and that defendant and its assignor did not demand deliveries at the rate of ten per day, and it was mutually understood and agreed on or about May 16, 1920, that the Hudson Company was to make deliveries of such bodies in accordance with its ability to obtain competent and adequate labor and material, and obtain available and adequate transportation facilities.

It is then alleged:

" 21. That on the following dates respectively, the plaintiff's assignor had on hand and ready for delivery, the following quantities of bodies which had been completed for the respective week ending on the respective dates hereinafter mentioned, and for which the plaintiff's assignor mailed to the defendant invoices bearing the following respective dates, and which were received by the defendant:

| Date 1920 | Quantity | Amount |
|---|---|---|
| July 23d. ........... | 35 bodies........... | $4,870 25 |
| July 30th........... | 35 bodies........... | 4,870 25 |
| August 6th........ | 35 bodies........... | 4,870 25 |
| August 13th........ | 35 bodies........... | 4,870 25 |
| August 20th........ | 25 bodies........... | 3,478 75 |
| August 27th........ | 25 bodies........... | 3,478 75 |

That altogether, the amount of said invoices aggregated the sum of $26,438.50, upon which the defendant was entitled to a credit at the rate of $12.00 per body, or a total of $2,280.00, and a further credit of $2,800.00, which constitutes an overpayment made by the defendant to the plaintiff's assignor, leaving a balance of $21,358.50.

" 22. That all of the aforesaid bodies, invoices as aforesaid, were subsequently shipped to the defendant by railroad cars, with the exception of three bodies, and that said three bodies are still on hand, and the plaintiff's assignor is ready, willing and able to ship the same to the defendant."

It is further alleged that defendant did not, upon receipt of

such invoices, pay to the Hudson Company the sum of $21,358.50, but paid on account thereof the sum of $5,000, leaving a balance due and owing in the sum of $16,358.50, no part of which has been paid, though duly demanded; and that the Hudson Company duly performed each and every of the terms, covenants and conditions of the contract as modified and waived as aforesaid.

For a second cause of action, plaintiff realleged all the facts set forth in its first cause of action. Further, it alleged that at the time of the making of the contract, and at the time of defendant's failure to pay the purchase price for the bodies invoiced and shipped to it, it and its assignor well knew that such failure and breach of the contract would imperil the position of the Hudson Company, and well knew that unless payments were made in accordance with the contract, the Hudson Company would be unable to pay its creditors for raw materials and its workmen their wages, and that its position would be otherwise imperiled and that such needs of the Hudson Company were urgent. Despite which, defendant willfully failed to comply with the terms of its contract by failing to pay the purchase price of the bodies and expressly stated that it could not and would not be in a position for some time to pay the same. As a result of such breach of contract the position of the Hudson Company was imperiled; that the essential purpose of the parties at the time the contract was made was defeated; that the Hudson Company was unable to pay its workmen their wages and was unable to pay its creditors its indebtedness for material purchased; and that in view of the defendant's failure to give reasonable assurance that the said breach of the said contract would be promptly repaired, and because of the said failure of the defendant to make such payment, the plaintiff and his assignor duly gave notice that they elected to terminate the said contract and to hold the defendant liable for all the damages sustained by reason of such breach. If defendant or its assignor had duly complied with the terms of the contract, the Hudson Company would have realized as a result of the performance by it of the said contract, a profit in the sum of $68,696.97. In reliance upon the contract, the Hudson Company had purchased material and caused labor to be bestowed upon the articles to be manufactured as aforesaid, which cost it the sum of $107,315.95. At the time of the defendant's breach, the goods partly manufactured were, on account of the unavailability of a general market, and on account of the fact that they could not be put to other uses, rendered partially worthless and they were not reasonably worth more than $8,099.40. The damages for the defendant's breach as aforesaid totals the sum of $167,915.52, no part of which sum has been paid.

The Hudson Company has duly assigned to plaintiff the aforesaid cause of action. In conclusion it is alleged that said Hudson Company duly performed each and every of the terms, covenants and conditions of the contract as modified.

The answer of the defendant denies practically all the allegations of the complaint, but admits the making of the original contract of August 21, 1919; that certain modifications thereof and of the specifications were agreed upon whereby the price of the bodies was increased, and further admitted that the contract was assigned to it by the Templar Company, and that certain bodies were shipped by the Hudson Company to it. For a first defense, and by way of counterclaim, it sets up that between January 16 and March 18, 1920, the Templar Company loaned to the Hudson Company the sum of $30,000, of which only $5,040 has been repaid, leaving a balance due of $24,960, which counterclaim has been assigned to defendant. For a second defense, it sets up the Statute of Frauds, in that the original contract was an agreement which by its terms would not be performed within the term of one year from the date thereof, and that the alleged modifications set forth in the complaint were modifications of a contract which could not be performed within a period of one year from the date of said contract, and that said modifications were not made in writing and subscribed by the defendant or its lawful agent.

For a third defense and by way of counterclaim, it was averred that certain bodies delivered under the contract to defendant and resold by it, were found not suitable for use, having been defectively constructed, the defects not being apparent upon inspection, but only after use. These defects consisted in that the rear parts of the bodies were not of sufficient strength to withstand the strain placed upon them when in motion, as a result of which the bodies cracked and split across the back. To repair the bodies which had been delivered and to reinforce those still in defendant's possession cost the defendant $15,948.21.

For a fourth defense and by way of counterclaim, defendant alleges that some of the bodies delivered to it were improperly assembled, marred and otherwise damaged, and that certain parts thereof were not furnished and attached, to remedy all of which cost defendant $3,500.

The reply of the plaintiff denies all the new matter set up in the answer.

Upon the trial it appeared that besides the contract in suit, there was made on the same day another contract whereby the Hudson Company undertook to build for the Templar Company fifty aluminum roadster bodies, right-hand drive, at the price

of $135 each, f. o. b. New York city, to be delivered between the first week of October and November 15, 1919. These fifty bodies were in fact not delivered until March twenty-fourth, and April third, twenty-four being delivered on the former date, twenty-six on the latter.

It also conclusively appeared that the Hudson Company was inadequately financed for an operation of the magnitude of the manufacture of the 2,500 bodies. Its largest contract theretofore had been one for 50 sedan bodies, made with a concern in which its treasurer was interested. Although incorporated in 1916, with an original authorized capital stock of $500,000, its actual capital consisted of $19,000, of which $7,000 to $9,000 was in cash and $10,000 to $12,000 in certain assets of a going concern for which it issued stock. Thereafter its capital stock was reduced to $250,000, but no other stock was sold. At the time of the making of the contract in question its president and treasurer was Jacob House, who had been in the dress and waist business and also doing efficiency work for a bank, but who had no previous experience in the automobile building business when he became secretary of the Hudson Company at the time of its organization. At the end of September, 1919, the cash on hand belonging to the company amounted to less than $6,000.

The strike of the Hudson Company employees began on October 14, 1919, and continued until February 9, 1920, but all the men did not return to work until two or three weeks later. But little work was done during its continuance. In January, 1920, a suggestion was made that the Templar Company advance $25,000 to the Hudson Company, and on January fourteenth the former did in fact advance to the latter $10,000 to assist it to take in the aluminum then at the dock, as otherwise it would be resold within a few days. At the solicitation of the secretary of the Hudson Company, who made a trip to Cleveland for that purpose, the Templar Company made a further advance of $5,000 on January sixteenth, upon being furnished with a sworn financial statement of the Hudson Company showing net assets of $58,260.75, which included $38,740.31 of raw material for the Templar contract, as well as work under construction therefor. It was arranged that the Hudson Company should deduct $6 per body on the 2,500 left-hand drive bodies, or at the rate of $2 per body for each $5,000 advanced by the Templar Company. At first the latter wanted a mortgage as security for the advances, but the Hudson Company claimed such a course would embarrass it and impair its credit, so the Templar Company finally consented to take a bill of sale of certain material instead. So it received from the Hudson

Company a receipted invoice for 30,000 pounds of aluminum. Further advances were made aggregating $15,000 on March tenth and sixteenth, for which two bills of sale were delivered, covering 40,000 pounds of aluminum, and also other material. It was ultimately agreed that in repayment of these advances $12 should be deducted from the price of each body. Up to this time no bodies had been delivered under either contract.

The first shipment of left-hand drive bodies was made on May 4, 1920. Under the contract and specifications, certain castings were to be attached thereto, known as backrail castings, being metal sockets placed on the top on either side of the body, just behind the seat, intended to receive the iron supports for the top. The right-hand drive bodies had been shipped without these castings, and the Templar Company had agreed to allow the Hudson Company to furnish the castings omitted that the former might put them on; but the former also insisted that in future shipments the castings were to be fitted to the bodies before shipment. Despite this notice, and in violation of the contract, the first shipment of left-hand drives was sent without these castings.

The president of the Hudson Company on April thirteenth took the invoice covering the shipments of right-hand drive bodies to Cleveland. The invoice amounted to only $7,200, but at his request and on his statement that his company was hard pressed for cash, the Templar Company gave him a check for $10,000.

On May sixth the Hudson Company sent the Templar Company an invoice for $6,818.35, covering forty-nine left-hand drive bodies, with a notation thereon that the bodies were on their storage floor, and the further notation that these bodies were without castings as the castings had not yet been received from the maker. At the same time the Hudson Company wrote the Templar Company as follows: "We have completed to date an additional 49 bodies and Mr. Stewart has to-day sent the bill to Mr. Reed. I direct your attention to the fact that castings have not been received from the manufacturer. You will, of course, I trust not permit this to delay the check."

In reply to this the Templar Company wrote on May tenth that it could not and would not accept bodies not completed; that "In regard to putting these bodies into storage not completed, having us pay the storage, we do not think this right, because the bodies are not our property until completely manufactured by you, at which time you will put them into storage until you are able to ship. I do not see why we should put uncompleted bodies into storage and pay for same, relieving you of every responsibility.

" There is only one thing for you to do and that is as we do, to bend every effort in your power to get this material in by truck or trunk or any other means you can, as we are forced to do. You will have to build bodies complete before ever billing us for same."

On the same day the Templar Company's president wrote to the Hudson Company's president a letter in which he said:

" I can hardly see how you can expect we will take forty-nine bodies from you that are not completed, are without the castings, we have no arrangements with you to put these castings on in the first place, the contract calls for the castings to come on the body in completed form.

" It seems to me, Mr. House, that we have done our part in helping you in the matter and there is a limit to what we can do.

" Why don't you have these castings trucked to you or even a passenger car could get these castings to you. It looks to me that you are passing the buck to us too strong. We are trucking stuff from New York to Cleveland and points in Illinois to Cleveland and if you are having trouble in getting the castings on account of railroad and express companies all you have to do is to get a passenger car and haul these small castings and put them on."

The Hudson Company telegraphed it was in urgent need of money and asked for a check from the Templar Company, to which the latter replied by telegraph on May eleventh:

" We did not agree and surely you cannot expect us to pay for unfinished bodies if castings come to you within a few days why not finish the bodies and proceed regularly."

In answer to this the Hudson Company wrote saying in part:

" If as we imagine you are, in doubt as to the security of your money, these bodies have been billed to you and are naturally your property and the only item missing is the castings which amounts to very little in comparison.

" Our position, at the present moment, is as follows: We have to meet the payroll this Saturday and also Bills Payable of $6,000.00. While the bill which you have is not sufficient to cover all this, we will forward another bill for another carload of bodies — approximately twenty-two bodies which will about cover our needs."

On May thirteenth the Templar Company sent to the Hudson Company a check for $6,000, with a letter in which it said:

" Your invoice of May the 6th covering 49 bodies to the amount of $6,818.45. We wish to explain our method in handling this invoice, due to the fact that these bodies are not complete and are helping you out insofar as paying this to cover your payroll, and other bills.

10

"We are sending our Mr. Crosbie with the check to New York to-night to the amount of $6,000 to take care of this.

"We are deducting $12.00 per body as per agreement on the money advanced and will hold the other amount until such time as those bodies are completed, and will then advise you of the time and labor to fit the castings and rails which you are sending to us."

In its letter of May tenth the Templar Company had already notified the Hudson Company that if it shipped bodies without castings, which would necessitate putting a man on the job at considerable expense, it would deduct on the invoice on the time and material basis.

As early as April, 1920, the Hudson Company had complained about the difficulty it was having in securing freight cars. At a conference on April twenty-eighth, in Cleveland, between the presidents of the two companies, the Hudson Company's president said that they had bodies ready which the Templar Company's chief inspector would not allow them to store; that the former was being held up for money again and its position was that it needed money continuously. The Templar Company's president then said that he had instructed its chief inspector, when the Hudson Company made out a bill, to O. K. it, and upon receipt of the bill a check would follow until things got a little easier.

About the middle of May the secretary of the Hudson Company told an inspector for the Templar Company that there was another shipment of aluminum on the dock and asked him to take it up with his home office and see if they would buy it. At a conference held on May nineteenth, at the Hotel Pennsylvania in New York city, participated in by representatives of both companies, this shipment was discussed. The Templar Company's president, Bramley, expressed surprise that the Hudson Company did not have sufficient aluminum to complete the contract, saying to Reed, the Templar Company's treasurer: "I thought you told me that they had enough aluminum to complete the contract," to which Reed replied: "I thought they did." However, the fact was that at that time the Hudson Company had only enough aluminum to complete 1,145 bodies. Bramley then said that after the Hudson Company had completed 1,145 bodies there would still be due his company over $15,000 of the amount advanced, for which it would have no security. He stated: "What we are interested in now is whether or not you are going to be able to complete this contract," and that the Templar Company would not advance any more money. It was then suggested that House (the Hudson Company's president) endeavor to arrange with the people from whom he purchased the aluminum to secure the balance which he would require, at a later

date and at the same price. It was arranged that they would meet again in the afternoon, House agreeing to adjust the aluminum situation in the meantime. When they met at the same place in the afternoon, House reported that the people from whom he had ordered the aluminum had agreed to replace it at a later date. There was also some discussion with respect to recording the bills of sale previously given by the Hudson Company to the Templar Company. The attorney for the latter company stated that he understood that these bills of sale afforded no security unless they were recorded, but both House and Stewart, for the Hudson Company, objected to having them recorded, claiming that if this were done it would impair their credit. Bramley told him that he did not want to do so and suggested that Stewart take the matter up with the company's New York attorney, Mr. Schulman, to see if some arrangement could be made.

Bramley then asked Stewart and House whether they did not want to cut the contract down to 1,500 bodies. They declined to do this and asked him if he wanted to cut it down. He said that, on the contrary, the Templar Company wanted the bodies but thought that the Hudson Company could not turn them out. House said that they were turning them out and would continue to.

Bramley then said that he understood that they were having difficulty in getting freight cars. Stewart, the Templar Company's secretary, told him that they were, that after repeated efforts he had secured a permit to ship four cars and then could not get cars that would hold more than one to four bodies. Bramley said he did not want them shipped that way and House said that the Hudson Company was crowded to capacity, that its storage space was filled and that if they could not get cars they could not continue to store the bodies in their factory any longer but would have to put them in a public warehouse. Bramley objected to this, saying that it was expensive and that the bodies would be damaged if this were done and wanted to know if there was not some way that this could be worked out. House then said that they could store some of the bodies but that if they became too cramped it would be necessary to put the surplus in storage, but that one of the principal things that the Hudson Company was interested in was in getting paid for the bodies when they were manufactured. Bramley then suggested that as they manufactured the bodies they send bills for them and make every effort to get cars, that is, to ship all they could and store the balance. Reed objected to this as it would mean sending bills for small numbers of bodies, so Bramley proposed that the Hudson Company at the end of each week make out

a bill for the bodies that had been completed ready for shipment during the week and that the Templar Company's inspector should inspect the bodies to ascertain that they were all right and that the number shown on the bill had actually been completed and that the inspector should then O. K. the bill, and agreed that the Templar Company could pay invoices O. K.'d in that manner. During the discussion regarding the storage of and payment for the bodies then on hand at the Hudson Company's factory, House admitted that these bodies were not complete. He and Stewart were told by the Templar representative that they had no right to put uncompleted bodies in storage or to ship them. In fact, the bodies then in the Hudson Company's factory did not have these castings attached. The last thing that Bramley told House and Stewart was that the Templar Company's inspector at the Hudson Company's plant should check the number of bodies completed and approve them and that his O. K. should go on the invoice.

All of the testimony of House and Stewart as to the alleged modification of the original contract was subsequently stricken out by the learned trial court, at the close of the case, upon the ground that such modifications should have been in writing, but it is stated herein that plaintiff's contentions may be made clear, and its exclusion is claimed to have been error.

The Hudson Company the same day delivered an invoice dated May nineteenth to Bramley at the Hotel Pennsylvania for fifty bodies, bearing this memorandum:

" Castings not received from maker. Bodies O. K.'d less castings. Subject to acceptance by Templar Motors Co. at factory.
" (Sgd) E. K. CROSBIE,
" *Inspector.*"

Invoices of July twenty-third, July thirtieth, August sixth, August thirteenth, August twentieth and August twenty-seventh, which it is alleged the Templar Company failed to pay, and upon which failure the breach of contract is predicated, bore no notation of O. K. by any one.

The bills rendered to the Templar Company up to and including July sixteenth had been paid, although the situation had never been entirely satisfactory to it. The Hudson Company was not financially strong enough to handle the contract it had undertaken. The strike of about four months' duration had added to its embarrassment and caused a lengthy postponement in its deliveries under the contract. The Templar Company had not only been compelled to anticipate payments in order to assist the Hudson Company, but had been obliged to advance $30,000, taking bills

of sale of materials to be used in its bodies, which bills of sale it could not make a matter of record for fear of still further impairing the Hudson Company's credit, and the amount of which loans it was to get back only by a fixed allowance of twelve dollars on the purchase price of each body. The bodies had not been delivered complete as to castings, and the delays were continual and aggravating. Meantime there was a general financial stringency.

On August sixth the following letter was sent:

" CLEVELAND, *Aug.* 6, 1920.

" J. HOUSE, *Presdt.* Hudson Body Corp.,
 " 507 West 35th St.,
  " New York City.

" DEAR SIR.— We have co-operated with you in the past, we now have about 300 surplus Roadster Bodies on hand, and practically no demand.

" We wish to arrange with you to stop production entirely or limit production to a minimum.

" Kindly advise quickly just what you can do about the matter. This is very important.   Very respectfully,

" M. F. BRAMLEY,
"*President & Gen. Manager.*"

As the result of this letter the representatives of the two companies met at the Murray Hill Hotel in New York city on August thirteenth. At the first conference Bramley said he had been traveling for the past week canceling orders; House replied that his contract provided against cancellation and that if it were canceled the Hudson Company would hold the Templar Company for damages. Bramley then asked if they had received his letter (referring to the above letter of August sixth). House said he had. He stated the first consideration at that time to be past and overdue bills amounting to about $14,000. House wanted to know whether he was going to get the money. Bramley told him that the Templar Company was not paying out any money at that time; that he had put into the company personally $70,000 and he would put in no more; that they were not paying any bills. House then said: " If you will not pay us our bills, we are going to hold you responsible for your contract; we will have to close too. We can't continue. We have about $100,000 worth of merchandise in the house. We owe bills due and past due; have to pay payrolls and we have to meet our obligations, and if we can't do that, you will be the cause of our closing down."

They met again the following day and Bramley asked if they had thought over any plan. House told him that they would be

willing to close down for a month if the Templar Company would pay all overhead and it must also give them a minimum of $10,000, or $11,000, to meet bills and payrolls; that he would wait a week for the balance but could not wait longer as his bills were pressing. Bramley told him that they would give them trade acceptances. House said that would be all right provided his bank would accept them and it was agreed that House should take it up with his bank.

The parties met again in the afternoon and House reported that the bank would not take the trade acceptances, but that he would talk to his creditors and see if they would accept them. All the Hudson Company wanted was cash for its payrolls; the balance to pay bills with. Bramley told House to let him know about the trade acceptances. House agreed, but said that he must have money the following week to meet payrolls because he had none; that he had received a check from the Templar Company that morning for $2,000 but that was not sufficient to meet his payrolls.

At Bramley's request a list of the Hudson Company's past due accounts, notes and average overhead was given him, showing accounts past due of $11,659.04, of which $6,122.06 might be paid by notes and the balance, to wit, $5,536.94, must be paid in cash; an item of $3,000 repayment of cash borrowed to meet payrolls of August thirteenth, and notes due August nineteenth amounting to $9,000, which must also be paid in cash; making a total immediate cash requirement of $17,536.94; also $34,750 in notes which would mature during the month of September. The statement gave the overhead per month as $3,800.

Assuming that the Hudson Company was entitled to payment at that time for all invoices sent up to and including August thirteenth, the maximum amount for which it could have made claim against the Templar Company on that date was about $8,600, and that only by disregarding the balance still due the Templar Company, on its loan of $30,000, or $23,700 after deducting the allowance of $12 on all bodies delivered.

Discussions followed (and had in fact previously been held) as to the Templar Company giving security for the $30,000 advance. The condition of the Hudson Company was claimed, upon its own statement, to be one of hopeless insolvency, but its president retorted that it was in better financial condition than the Templar Company, but he refused to allow its books to be audited.

On August thirty-first a demand was made on the Templar Company for money by a representative of the Hudson Company who said the latter had past due accounts and a payroll to be met and they had not received money from the Templar Company in some time. It was then suggested that the Hudson Company

take trade acceptances and shut down for sixty days, the Templar Company paying the former's overhead charges during that period. Its representative was asked how much the overhead would be, and he did not know. Throughout the discussion it was insisted that the Templar Company owed nothing to the Hudson Company; that the only thing for consideration was what the former could do to aid the latter. House testified that the last day of work was September first, though he earlier gave the date as the week ending September ninth.

The representative of the Hudson Company returned to Cleveland on September ninth, and told Bramley that his company was willing to shut down if the Templar Company would pay the overhead amounting to between $3,000 and $3,300; but that it could not raise any money on trade acceptances; it would have to have cash. Bramley then said he could not pay any cash at that time. The Hudson representative threatened suit and Bramley said: " Well, let them sue me." He said that the best thing that the Hudson Company could do would be to file a petition in bankruptcy, have House (its president) appointed receiver and then if it desired the Templar Company could arrange with the receiver to go on with the contract. Thereafter this action was commenced.

Viewing the first cause of action from the most favorable viewpoint for plaintiff, it may be considered, as he now claims it should be, as one for merchandise sold and delivered to defendant. Upon the trial plaintiff's counsel stated that plaintiff was seeking by the first cause of action to recover moneys due under the contract, with all its modifications and variations, for merchandise shipped. This merchandise, plaintiff claims, the defendant accepted, but has not paid for. He contends that the manufacturer's obligation under the contract (deliveries being provided to be made f. o. b. freight cars New York) was fulfilled when his assignor turned over possession of the bodies to the carrier and forwarded the bills of lading to defendant. Defendant concededly received both the bills of lading and the invoices for the goods, and plaintiff claims that its retention of the same without protest waives any right to claim that the contract had not been complied with.

In the present case there is not a word of testimony that the bodies involved in the first cause of action ever reached the defendant, or were accepted by it, or passed into its possession, or that it exercised any acts of ownership in relation thereto.

Plaintiff upon the trial, as has been said, claimed the right to recover the amount sued for in the first cause of action under the contract; but he cannot recover upon the original contract, because he has not sued under it, nor were the deliveries made as called for

therein. And he cannot recover under the amended and modified contract, under which he does in fact sue, because that contract is unenforcible for reasons which will be stated later.

Treating this cause of action as one for goods sold and delivered, there are vital omissions in the plaintiff's proof necessary to support such a cause of action. This may be due to the inability to supply the same, or perhaps to the feeling that the issue was involved in the second cause of action, for breach of the contract, which was plaintiff's principal concern. In any event, the following defects exist in the proof, which preclude a recovery: *First.* There is no proof that the bodies shipped, and for which payment is sought, were completed in accordance with the original contract (or in fact, with a modified contract or any form of contract whatever), or with the specifications agreed on. The testimony of House refers to " completed " bodies, but this simply represents his viewpoint, and as bodies had been before sent without castings and other parts, he cannot be inferred to have meant that they were completed according to the contract and specifications, and he never testified that they were so completed. This in itself is vital, for where it is sought to appropriate goods to the contract and to pass title to the buyer without his consent, where such goods are to be manufactured according to a particular design, title does not pass unless the article is completed and complies strictly with the requirements of the contract and specifications. It may be noted, although on April twenty-third the Hudson Company wrote to the Templar Company that it had at that date fifty-one bodies on hand on its storage floor which it claimed had been O. K.'d, and for which it demanded payment, that in fact there were on hand then no completed bodies, and that none of them had the castings; so that the sense in which the Hudson Company officials used the word " completed " was completed according to their idea of what was right, and not according to the plans and specifications. Nor was Stewart able to swear that the fifty-four bodies which he claimed were on hand, completed, on May nineteenth, were furnished with castings. And it is significant in this connection that Stewart swears that the bodies which were shipped without castings were never paid for or returned to the Hudson Company. There is not a word of testimony, nor any testimony from which the inference can be drawn, that the bodies included in the first cause of action were completed in accordance with the contract or with the specifications agreed upon. *Second.* No effort was made to prove the reasonable value of the bodies at the claimed time of delivery to the carrier. *Third.* The bills of lading and the invoices **do not** correspond as to either dates or amount of shipments. The

record upon that point is most vague and unsatisfactory, nor is the lack of correspondence between the two sets of documents cured by any testimony in the record. *Fourth.* It is impossible to identify any particular bodies with those called for by the bills of lading, and the testimony does not aid in any way in so doing. *Fifth.* Even under plaintiff's own theory as to the modified contract then in existence, he had failed to prove (a) that the bodies were completed according to the contract and specifications; (b) that they had been inspected by defendant's inspector, or (c) that the invoice had been O. K.'d by him. *Sixth.* Appellant claims that all the bodies not paid for had been delivered to the carrier; but for aught that appears they may have been manufactured and paid for before then as stored bodies. *Seventh.* Plaintiff utterly failed to explain what became of the goods after their alleged delivery to the carrier, and in particular failed to show that they ever reached defendant or were delivered to it. These are some among many reasons why it seems to me plaintiff has failed to establish by sufficient proof its first cause of action, and the same was, therefore, properly dismissed.

As to the second cause of action, I am of opinion that the dismissal also was proper. In view of all the testimony as to what occurred at the later conferences between the representatives of the two companies, I think, if plaintiff had proved performance on the part of the Hudson Company of a valid contract and had otherwise made out a case, that it would have been a question of fact for the jury whether, under the Personal Property Law, defendant had been guilty of such a breach of the contract as would have entitled plaintiff to sue for damages as for breach of the entire contract.

Subdivision 2 of section 126 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides: " Where there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

In *Helgar Corporation* v. *Warner's Features* (222 N. Y. 449) Judge CARDOZO said: " The failure to make punctual payment may be material or trivial according to the circumstances. We must know the cause of the default, the length of the delay, the

needs of the vendor and the expectations of the vendee. If the default is the result of accident or misfortune, if there is a reasonable assurance that it will be promptly repaired, and if immediate payment is not necessary to enable the vendor to proceed with performance, there may be one conclusion. If the breach is wilful, if there is no just ground to look for prompt reparation, if the delay has been substantial, or if the needs of the vendor are urgent so that continued· performance is imperiled, in these and in other circumstances there may be another conclusion. Sometimes the conclusion will follow from all the circumstances as an inference of law to be drawn by the judge; sometimes, as an inference of fact to be drawn by the jury."

But conceding that such an issue of fact would have been raised on the present case if plaintiff's claim were otherwise fully sustained, the infirmity which is inherent in his cause is, it seems to me, again fatal to a recovery.

For he is asserting a cause of action based upon his contention that the original written contract between the parties had been modified by oral agreement, and he claims that his assignor had performed this modified contract, that the defendant was in default thereunder, and that by reason of such default he is entitled to recover damages as for a breach of this modified contract, which defendant had unlawfully violated in an essential part and thereby terminated.

In the first place, the original contract was one which was required to be in writing, as by its terms it could not have been performed within the period of one year from its date, and, therefore, it came within the Statute of Frauds.

Section 31, subdivision 1, of the Personal Property Law provides: " Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

" 1. By its terms is not to be performed within one year from the making thereof; * * *."

The written contract between the parties was dated August 21, 1919. By its terms the Hudson Company agreed to manufacture 2,500 aluminum automobile roadster bodies " deliveries to commence on December 1, 1919, at the rate of ten per day * * *. Invoices to be dated day bodies are accepted by the transportation companies for shipment. Invoices dated 1st to 10th inclusive, due and payable 20th inst. Invoices dated 11th to 20th inclusive, due and payable 30th inst. Invoices dated 21st to last of month, due and payable 10th of following month."

This was a contract for manufacture as well as for delivery. It cannot be assumed that it was or was meant to be a contract to do an unlawful thing, and, therefore, it must be deemed to have provided for such manufacture and delivery on work days, and not on Sundays. Nor is there any evidence in the case that the Hudson Company did in fact operate its factory or do any business on Sundays. Therefore, the time required to perform the original contract was 250 working days, commencing on December 1, 1919, which would have made the period end on September 14, 1920, which is more than a year from the time of making the contract. This computation makes no allowance for holidays. The order for top rail castings for these 2,500 bodies placed by the Hudson Company with the Rostand Company shows that it expected to make and deliver only 250 bodies per month.

Plaintiff's counsel in fact concedes in their main brief that the deliveries were to be made at the rate of ten a day or sixty a week, and are limited thereto. And they only claimed to have billed the defendant in all for 607 left-hand drive bodies down to and including August 27, 1920, less than one-fourth of the total contracted to be built.

Plaintiff seeks to sustain the offer in evidence of the conversations at the Hotel Pennsylvania conference, and the claim of a modified agreement based thereon, upon the ground of waiver of performance, and cites in support of that contention the case of *Imperator Realty Co.* v. *Tull* (228 N. Y. 447). But there the subsequent oral agreement was not pleaded, or relied upon, as constituting a modification of the original contract, but was offered in evidence as an excuse for failure to comply with one specific provision of the contract, and the majority opinion went upon the ground that plaintiff, having by his mutual oral contract with defendant induced defendant, who relied thereon, to become in default on the law day by omitting to have certain violations removed from the property contracted to be sold, should not be allowed to take advantage of an omission induced by his unrevoked consent. As Judge CHASE said in that case (at p. 451): " The oral contract did not purport to be inconsistent with any material part of the written contract, nor to substitute a new oral contract for any material part of the written contract. The plaintiff was simply told in effect to let the violations stand unsatisfied until the due day and then provide for the expense of satisfying the same by a deposit in cash. The extent of the violations was inconsiderable."

The present case offers no parallel with the case cited. This is not a mere change in some slight detail, but an entire recasting of

the contract in some of its most important and vital provisions. Under the agreement of modification claimed by plaintiff, little was left of the original agreement of the parties reduced to writing with great care and particularity, save the aggregate number of bodies contracted to be manufactured and price therefor, which had been several times changed, but always in writing. The amount of each delivery, the manner of delivery, the provision for inspection, the time of payment and the requisites therefor — all were changed. Bodies were no longer to be delivered to the Templar Company, but to remain in the possession of the Hudson Company, in its own storage rooms, and to be paid for before the Templar Company ever received them. Such important, vital and unusual changes would constitute a practically new contract. Certainly they are so integral a part of the agreement itself as to require that they, like the original contract, should have been reduced to writing. I am of the opinion, therefore, that the testimony of House and Stewart as to the making of the oral agreement was properly excluded, and that the alleged modifications, having been solely oral and never reduced to writing, are void and invalid, and effect no change in the original contract.

As plaintiff is relying upon the contract as modified, and claimed only to have performed thereunder and according to its modified terms, he never claimed, or sought to prove, performance of the contract in its original form, and clearly did not so perform.

Not having proved performance of the original contract, and claiming to have performed only a contract which is void under the provisions of the Personal Property Law (Statute of Frauds), it follows that the second cause of action was properly dismissed.

The judgment appealed from should be affirmed, with costs.

CLARKE, P. J., SMITH, PAGE and GREENBAUM, JJ., concur.

Judgment affirmed, with costs.